NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0018n.06

No. 18-1127

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 14, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ARMANDO NIEVES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| ENVOY AIR, INC., | ) | MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: SILER and KETHLEDGE, Circuit Judges; OLIVER, District Judge.[*]

**OLIVER,** District Judge. Armando Nieves ("Nieves") sued Envoy Air Incorporated ("Envoy") for wrongful termination. Nieves claims that Envoy violated: (1) the Family and Medical Leave Act ("FMLA") by terminating him in retaliation for using medical leave; (2) the Michigan Persons with Disabilities Civil Rights Act by terminating him because of his disability; and (3) the Michigan Elliot-Larsen Civil Rights Act by terminating him based on his race and ethnicity. The district court granted Envoy's motion for summary judgment on all counts. We **AFFIRM**.

**I.**

Nieves, a Hispanic-American, worked as a gate agent for Envoy Air for 19 years. Envoy, formerly known as American Eagle, is an affiliate of American Airlines ("American"). In 2008, Nieves and his wife, Sahara Vargas ("Vargas") (also an Envoy employee), were transferred by the

---

[*] The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

airline to Grand Rapids, Michigan to work at the Gerald R. Ford Airport ("GRR"). Nieves's responsibilities included working at the ticketing counter, customer service desk, loading luggage, and directing planes on the jet way.

In September 2014, Envoy transferred a new General Manager, Mitch Felkey ("Felkey"), to GRR. Shortly after Felkey joined, a few conflicts arose between Nieves and Felkey. For example, on one occasion, company training files went missing and Felkey blamed Nieves. When Felkey became aware that the files were missing through no fault of Nieves, he did not offer Nieves an apology. On another occasion, when Nieves was absent from his assigned duty station, Felkey threatened Nieves with termination unless he procured statements from coworkers that could corroborate his explanation that he was absent because he was assisting a customer.

## A.     American initiates a travel audit.

In the Spring of 2015, American commenced a travel audit of its employees and the employees of its affiliated airlines. The purpose for the audit was to look for travel privilege abuse by employees. According to American's policy, if an employee permits an ineligible individual to use travel benefits, that employee is subject to termination. The policy was disseminated to all of Envoy's employees. Although American was involved in the travel audit process and was initially a named Defendant, the parties stipulated to the dismissal of American from the case because American did not directly employ Nieves.

American's Employee Travel Privilege Department ("TPD") is responsible for managing all employee travel privilege programs, including audits of employees' use of such privileges. The TPD administers two types of audits—*specific* and *random*. A *specific* audit singles out individual employees, usually at the request of the employee's supervisor. A *random* audit occurs two to four

times per year, includes a group of employees, and is initiated by the TPD or American's corporate security. The department sends notice letters to the audited employees and coordinates the investigation with a human resources representative employed by American and its affiliated airlines.

In April 2015, the TPD conducted a *random* audit. In conjunction with this audit, Envoy claims that it mailed Nieves a letter informing him that he was selected for the audit; however, Nieves claims he never received such a letter. Nonetheless, Nieves received a second notification letter dated June 12, 2015. The letter informed Nieves that, as part of the *random* audit, he had until June 23, 2015, to send proof of eligibility for the travelers he had listed on his travel privileges log. The letter also included a list of acceptable forms of documentation that he could submit to prove the eligibility of the individuals he had listed. Nieves responded by faxing documentation related only to the family members that were active travelers at that time—his stepdaughter and his wife, Vargas. However, throughout Nieves's employment with Envoy, he listed several individuals on his travel log. Envoy maintains that Nieves was to submit documentation for each individual listed on his travel log during his tenure at the airline.

Nieves and Vargas have seven children—all of whom were listed on Nieves's travel log. Some of his children were listed multiple times because their status changed from "child" to "student." At some point, Nieves also listed two other individuals as students or children. The first, Arnaldo Melo ("Melo"), was the son of a close friend of Vargas's. Melo's mother, who was living in the Dominican Republic at the time, wrote Vargas explaining that she could no longer take care of Melo. Nieves and Vargas agreed to move Melo to the United States and take him into their home. The second was Vargas's half-brother, Denys Martinez ("Martinez"). Martinez was staying with Nieves's family while he attended college.

Further, Nieves listed his mother's long-time companion, Daniel Cesar ("Cesar"), and classified him as his "Father/Step Father." Although Cesar and Nieves's mother had a long-term relationship, they were not married and did not have a recognized common-law marriage.[1] In all, Nieves's travel log, over time, contained a total of 24 names—Nieves, Vargas, their seven children (including duplicate entries), Vargas's mother, Melo, Martinez, Nieves's mother, and his mother's boyfriend. Except for Martinez, each of Nieves's listed members used travel benefits at least once while he was employed at Envoy.

After Nieves faxed the documents showing eligibility for his wife and stepdaughter, he did not hear from the TPD for a significant period of time. However, an email exchange initiated on September 15, 2015, between American's Director of Human Resources, Mike Whittle ("Whittle"), and Envoy's Senior Human Resources/Employee Relations Specialist, Nina Ingalls ("Ingalls"), indicates that the audit had not come to a close. Rather, Nieves's audit was added to a stack of audits that required further investigation.

It was not until September 25, 2015, and after Whittle sent out emails requesting updates on 15 of Envoy's outstanding audits, did Nieves's travel audit get elevated as a priority. Still, the auditing process moved at a slow pace. On January 21, 2016, Ingalls received another email from her superior asking for an update on the outstanding 2015 audits, including Nieves's, and requested that they be closed as soon as possible.

**B.      The audit investigation is delayed.**

On January 26, 2016, Ingalls emailed Felkey to coordinate her interview with Nieves. She indicated that she noticed that Nieves had been out sick since January 4, 2016, and asked Felkey

---

[1] Nieves claims that, during the course of this litigation, a previous supervisor gave him approval to add Cesar to his travel benefits list. However, nothing in the record indicates that he raised this argument during the audit investigation.

whether he thought Nieves had been abusing his sick leave or had "some type of serious medical problem going on?" (R.44-6, PageID.204.) Ingalls was unaware at the time that Nieves had been hospitalized the first week of January for stage three kidney failure. Felkey informed Ingalls that Nieves was in the hospital and that his condition was serious. Ingalls instructed Felkey on how to get Nieves on sick leave under the FMLA. However, Nieves's FMLA paperwork had already been completed on January 12, 2016, while he was in the hospital.

## C.     Audit investigation resumes.

After several weeks of recovery, Nieves returned to work on February 19, 2016, clearing the way for Ingalls to complete her investigation. On March 9, 2016, Ingalls conducted a telephone interview with Nieves and Felkey present. Nieves was not informed ahead of time of the interview, nonetheless he proceeded to answer Ingalls's questions regarding his travel privileges log.

Ingalls declared that she questioned Nieves about each of the entries on his travel log during the interview, including his mother's boyfriend, Cesar. Nieves claims that Ingalls never asked him about Cesar. However, Ingalls's interview notes, which became a part of her investigation memorandum that she submitted to American's human resources department, corroborate her account. They indicate that Nieves disclosed to her that Cesar and his mother had been together for over twenty years but had never legally married. After the interview, Nieves was instructed that he had until March 18, 2016—nine days—to provide documentation for each of the individuals listed on his travel log.

The following week, Nieves provided letters from the mothers of Martinez and Melo indicating that Nieves's family had taken care of their children in the past. Envoy maintains that the letters did not show that he had court-approved guardianship over the children. Further, Felkey

informed Nieves that the letters were not the kind of documentation that would prove he had legal guardianship; however, he forwarded the letters to Ingalls anyway.

After receiving the letters, Ingalls prepared a summary of her investigation and sent it to Barbara Starcer ("Starcer"), Envoy's Senior Human Resource Specialist, and Mariluz Duque ("Duque") (Starcer's supervisor). Ingalls informed them that Nieves had not provided proper documentation for Martinez and Melo, and no documentation for Carlos Martinez (Nieves's step-son), Daniel Cesar, and Felipa Trejo (Nieves's mother-in-law). In her correspondence, she noted that several individuals did not meet the criteria to be eligible travelers and inquired whether she "should even bother to ask for the proof of parent-in-law relationship" or "just move on in convincing the [general manager] that this is a violation of policy?" (R. 44-9.) Duque responded that when ineligible travelers use an employee's travel privilege, "termination is the outcome time and time again." (*Id.*) Starcer responded that she agreed and was on board with terminating Nieves. According to Envoy, this was consistent with a document maintained by American, the Employee Travel Incidents Matrix ("Matrix"), which outlines the recommended penalty for various offense committed by airline employees. (R. 45-20.) The recommended penalty for ineligible travelers, according to the Matrix, is termination. Therefore, Ingalls was instructed to tell Felkey that Nieves needed to be let go.

### D.    Termination of Nieves.

After conferring with her fellow human resources personnel, Ingalls forwarded a packet to Felkey that contained a summary memo, her interview notes, the documentation that Nieves provided, and Nieves's travel privilege log and usage history. Nothing in the summary contained information regarding Nieves's medical leave. She then instructed Felkey to begin the "off-

boarding" process for Nieves. In addition, on March 24, 2016, Ingalls sent an email to American's Travel Coordinator, Eileen Rudnick, requesting that she freeze Nieves's travel privileges.

According to Nieves, it was around this stage of the investigation that his wife, Vargas, told Felkey, without offering any names, that other employees were abusing travel privileges by selling "buddy passes" for profit. However, Felkey and Ingalls maintain that they did not see how this allegation would have helped Nieves, considering the review process was out of Felkey's hands at that time and the information did not exculpate Nieves.

The decision to terminate was reviewed by a three-person committee: Envoy's vice presidents of human resources, finance, and legal departments. The committee approved the decision to terminate Nieves. Ingalls drafted a termination letter that stated the following reasons for Nieves's termination: misrepresentation of facts, misrepresentation in obtaining employee benefits or privileges, and abuse of travel privileges. The letter explained that Nieves had violated Envoy Rules and Regulations #16, 34, and 37, which state:

> Rule #16: Misrepresentation of facts or falsification of records is prohibited.
> Rule #34: Dishonesty of any kind in relation to the Company, such as . . . misrepresentation in obtaining employee benefits or privileges will be grounds for dismissal . . . .
> Rule #37: Abuse of travel privileges will be grounds for dismissal.

She sent the letter to Felkey on March 30, 2016. Felkey approved, signed, and delivered the letter to Nieves. (R. 44-13.)

Nieves appealed the termination to Felkey's supervisor, Greg Ricketts, who worked out of Envoy's Headquarters in Texas. In his appeal, Nieves admitted that he "made a mistake when listing [Daniel Cesar]" as his father, and that he was not given enough time to prove his case in regard to Melo and Martinez since the documents needed were only obtainable in the Dominican

Republic. (R. 44-7, PageID.432.) Relying on Nieves's admission about Cesar's ineligibility, Ricketts upheld the committee's termination decision.

Nieves sued Envoy for wrongful termination on the three counts listed *supra*. The district court granted Envoy's motion for summary judgment on all three claims. Nieves now appeals.

**II.**

We review the district court's grant of summary judgment *de novo*. *Roell v. Hamilton Cty., Ohio/Hamilton Cty. Bd. of Cty. Commissioners*, 870 F.3d 471, 479 (6th Cir. 2017), *reh'g denied* (Sept. 21, 2017). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 281 (6th Cir. 2012). Here, Envoy bears the initial burden of showing that there is no genuine dispute as to any material fact. *Id.* If Envoy meets its burden, then Nieves must present sufficient evidence from which a reasonable jury could find for him. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Further, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Seeger*, 681 F.3d at 281 (citation omitted) (emphasis in original). In making this determination, the court must view the evidence in the light most favorable to the non-moving party. *Id.*

**III.**

**A.      Nieves's FMLA leave claim.**

The FMLA entitles employees to twelve weeks of leave, annually, for "serious health condition[s] that makes the employee unable to perform the functions of [his] position." *Arban v.*

*West Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). Employees may recover for violations of FMLA under two distinct theories: "(1) the *entitlement* or *interference* theory arising from 29 U.S.C. § 2615(a)(1); and (2) the *retaliation* or *discrimination* theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004) (emphasis in original). Nieves brings his claim under the retaliation theory.

In order to state a *prima facie* case under the FMLA based on a theory of retaliation, a plaintiff must demonstrate that: (1) they are engaging in an activity protected by the FMLA; (2) the employer knew that they were exercising their rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to them; and (4) a casual connection exists between the protected FMLA activity and the adverse employment action. *Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban*, 345 F.3d at 404). Under this theory, "[w]hat makes the employment decision unlawful . . . is the motive of the employer—namely, that the action was taken *because* the employee exercised, or complained about the denial of, FMLA-protected rights." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 512 (6th Cir. 2006) (emphasis in original).

When a plaintiff relies on indirect evidence to prove causation, such as proximity in time between the FMLA leave and the adverse employment action, the court must employ the three-step process explained in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to analyze the FMLA claim. *Skrjanc v. Great Lake Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). First, the plaintiff must demonstrate a *prima facie* case of retaliation. *Id*. Next, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. Finally, if the employer can offer a legitimate, nondiscriminatory reason for the adverse

employment action, the burden then shifts back to the plaintiff to produce evidence that the alleged nondiscriminatory rationale was in reality a pretext. *Skrjanc*, 272 F.3d at 315.

The first three prongs of Nieves's *prima facie* case are not in dispute. For this claim, Envoy argues that Nieves failed to establish a causal connection between his FMLA leave and his termination—the fourth element of his *prima facie* case. Nieves points to evidence in the record which he maintains raise genuine issues of disputed fact regarding whether his taking FMLA leave was causally connected to his termination.

First, Nieves argues that Ingalls's claim that he took "frequent FMLA leave" is probative of causation. A review of the record shows that Ingalls merely made a note to herself that Nieves had "frequent FMLs," as she was trying to schedule him from an interview to finish his audit investigation. In her deposition she states: "if I would have looked in his time and attendance and saw a lot of FMLs or [shift swaps], then I would have noted this because we are still trying to make sure when he would be available." (R.46-9, PageID.832.) In this context, Ingalls's private note to herself that Nieves was unavailable due to FMLA leave does not show that his FMLA leave was causally connected to his subsequent termination.

Next, Nieves asserts that the district court failed to construe the evidence in a light most favorable to him when it dismissed a comment Felkey made to Nieves's wife that Nieves was ill and should retire. However, examining the comment in the full context of the conversation between Felkey and Vargas, it is clear that Felkey was simply responding to Vargas's overview of Nieves's health condition. In her deposition, Vargas recalls the conversation as follows:

> [Question]: Okay. So tell me what you mean by that.
> [Vargas]: Well, when he came from the hospital, returned to work, Mitch pulled him [sic] aside and says [sic] – and asked me, "How is the old man doing?" And I said, "He's not doing too good."

> His kidney doctor told him, told us that he -- his kidney was only functioning at 25 percent, and his heart doctor say [sic] he need to have a job where he don't [sic] have that much stress and that he should not be -- require less lifting, repetitive lifting, that's how he said it.
>
> And then – and Mitch says, "Well, since, since he's that ill, he needs to retire." And I said, "He can't, because we have a lot of bills to pay," and that was the end of the conversation.

(R. 45-6, PageID.579.)

The district court was correct in concluding that the comment was too ambiguous to support Nieves's claim that the decision to discharge him was related to his FMLA leave.

Nieves also argues that his travel log was given heightened scrutiny and that this raises an inference of a causal connection. However, nothing in the record supports that he was subject to increased scrutiny beyond the ordinary inquiry that follows a travel audit within the company. Envoy maintains that Nieves was flagged for an audit due to the number of entries on his travel log. According to American and its Matrix, an employee's abuse of travel privileges is a terminable offense, regardless of whether the ineligible individual is currently listed or was in the past.

Finally, Nieves claims that he experienced negative treatment by Felkey in retaliation for using FMLA leave when Felkey commented, "if you cannot perform the duty, then we don't need you here." (R. 44-13, PageID.336.) However, Nieves testified in his deposition that Felkey made this general comment to a group of employees shortly after Felkey was transferred to GRR, and approximately one year before Nieves took FMLA leave.

Nieves has failed to establish a *prima facie* case of FMLA retaliation because he has not shown that his exercising of FMLA leave was causally connected to his termination. Therefore, the district court did not err in granting summary judgment to Envoy on this claim.

## B.    Nieves's disabilities claim.

Next, Nieves argues that Envoy violated the Michigan's Persons with Disabilities Civil Rights Act.[2] Michigan courts analyze these types of claims under the *McDonnell Douglas* burden-shifting framework. *See Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415, 437 n.26 (Mich. Ct. App. 2002). In order to make a *prima facie* showing under the Act, Nieves must establish that: (1) he is disabled as defined by the statute; (2) the disability is unrelated to his ability to perform the duties of a particular job; and (3) he was discharged because of his disability. *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 405 (Mich. Ct. App. 1999).

Although the parties dispute whether Nieves's kidney impairment falls within the statute's definition of disabled, this court does not need to determine this issue. Even if we assume that Nieves is disabled as defined by the statute, as the district judge did, and that his disability is unrelated to his ability to perform his job, he has not shown that his disability played a role in Envoy's decision to terminate him.

Nieves offers the same evidence he proffered in support of his FMLA leave claim to support his disability claim—Vargas's testimony that Felkey pulled her aside to inquire about Nieves's health and Felkey's comment that, "if you cannot perform the duty, then we don't need you here." As discussed above, when the conversation between Felkey and Vargas is viewed in its full scope, the comments about Nieves's health condition are too ambiguous to support a claim of disability discrimination.  And again, Felkey's statement about employees unable to perform their duties was not made in a context suggesting that it was aimed at disabled people, or Nieves in particular, and was made well before Nieves's alleged disability developed.  Accordingly, because Nieves has not established a *prima facie* case of disability discrimination under Michigan's

---

[2] M. C. L. A. § 37.1101

Persons with Disabilities Civil Rights Act, the district court did not err in granting summary judgment in favor of Envoy on this claim.

**C.      Nieves's race discrimination claim.**

Finally, Nieves alleges race discrimination under Michigan's Elliot-Larson Civil Rights Act. M.C.L. § 37.2101*, et seq*. Again, Michigan courts evaluate these claims under the *McDonnell Douglas* burden-shifting framework. *See Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 193 (Mich. 2003). To prevail on race discrimination, a plaintiff must first establish a *prima facie* case by showing: (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for his position, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Id.* at 192.

**1.  Nieves's *prima facie* case.**

The district court concluded that Felkey's alleged mocking of Nieves's accent, ignoring claims that other employees were abusing their travel privileges, and requiring Nieves to perform less desirable work than his Caucasian coworkers show that Nieves may have suffered from disparate treatment. *Nieves v. Envoy Air Inc*., 300 F. Supp. 3d 960, 975 (W.D. Mich. 2018). Because the district court also specifically found that there was "a genuine issue of fact as to [Felkey's] influence" over the decision to terminate Nieves, it concluded that Nieves established a *prima facie* case for race discrimination. *Id.* On appeal, Envoy does not challenge this determination. (Appellee Br. 36, n. 7.) Therefore, the only issue here is whether Nieves has set forth evidence showing that Envoy's legitimate, nondiscriminatory reason for terminating him was pretextual.

## 2. Pretext.

Envoy has advanced legitimate, nondiscriminatory reasons for terminating Nieves. Consequently, Nieves must demonstrate that Envoy's reasons for firing him were pretextual by showing that the reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the adverse action. *Dews v. A.B. Dick Co*., 231 F.3d 1016, 1021 (6th Cir. 2000). Nieves must also produce sufficient evidence from which a jury could reasonably reject Envoy's explanation and infer that it intentionally discriminated against him. *Clark v. Walgreen Co*., 424 F. App'x. 467, 474 (6th Cir. 2011).

All of Nieves's claims of pretext are insufficient when viewed in the light most favorable to him. First, Envoy's investigation revealed that Nieves improperly included his mother's boyfriend, Cesar, on his travel log and did not provide the necessary documentation to prove Martinez's and Melo's eligibility; all grounds for termination according to the airline's discipline policy. Second, contrary to Nieves's contention, Envoy presented document evidence indicating that other employees flagged for the same audit were terminated. Third, nothing in the record suggests that the delay in the investigation was designed to advance some ulterior motive. Although the audit investigation was slow, nothing in the record indicates that it was closed after Nieves provided his first set of documents in the summer of 2015. Rather, Nieves was one of several Envoy employees whose audit files required further investigation, and were not made a priority until Ingalls's supervisor put pressure on her to wrap up the audits.

Fourth, Nieves's claim that Envoy's revocation of his travel privileges prevented him from obtaining proof that he was the legal guardian to Martinez and Melo is not evidence of pretext under the circumstances herein. Nothing suggests that Ingalls deviated from company policy by restricting Nieves's travel privileges while he was under investigation. The fact that he was unable

use his travel privileges does not demonstrate that he could not obtain the documents some other way, including having Vargas, who had her own travel privileges, obtain the documents. In any event, this issue is of no consequence, in light of the fact that Cesar remained an ineligible traveler on Nieves's log.

Fifth, Nieves's claim that Felkey disregarded Vargas's complaint that other employees abused their travel privileges does not show pretext. No evidence suggests that Vargas's disclosure about other employees was provided in a timeframe or context that would have halted or discontinued Envoy's investigation into Nieves. Nor did the disclosure exculpate him. By the time Vargas made her complaint, the investigation of Nieves was almost complete. Ingalls testified that there was nothing Felkey could have done to alter the outcome if he tried.

Finally, Nieves's allegation that the travel audit was a pretextual ruse to cover for Envoy and Felkey's desire to treat Nieves, a Hispanic man, differently than other employees is not supported by any evidence. The audit was random and initiated by employees at American, not Envoy. Nieves was flagged because he had a significant number of individuals listed on his travel log. At each stage of the investigation, Envoy believed that Nieves violated its travel privileges policy by listing ineligible individuals. Further, Nieves admitted that he improperly included Cesar on his travel log when he appealed his termination decision to Ricketts—an admission that led Ricketts to uphold the termination decision. Accordingly, because Nieves has not shown that Envoy's decision to terminate him was pretextual, the district court did not err in granting summary judgment in favor of Envoy.

**IV**.

Because Nieves has failed to establish a *prima facie* case for his FMLA and disabilities claims, we find that the district court did not err in granting summary judgment to Envoy on these

claims. Further, because Nieves has not shown that Envoy's proffered legitimate, nondiscriminatory reasons for terminating him were pretextual, we find that the district court did not err in granting summary judgment to Envoy on his race discrimination claim.

For these reasons, we **AFFIRM** the district court's judgment.